Good morning, Your Honor. Irv Parks from the Appealing for Appellants, Jon Divens and the Law Offices of Jon Divens and Associates. And, Your Honor, we believe that the District Court committed fundamental, fairly seronious findings of facts with regards to key main points. Number one, that Mr. Divens was merely an escrow agent with regards to his duties and responsibilities to the CMOs. That Mr. Divens was not entitled to protection of a securities entitlement holder under Article VIII, and therefore not entitled to keep the interest that was generated with the CMOs. And then there's the whole issue of the Court, with its astounding statement that it found a testimony of Mr. Divens in its entirety to be wholly incredible, but the credibility and testimony of the Respondents to be credible. And how can we overturn that finding as a court of appeals when we didn't have an opportunity to see the beady eyes and the sweaty palms of each of the witnesses? Correct. Well, Your Honor, because there are clear facts that were submitted into evidence that contradicts the fact that the judge's determination that Mr. Divens was wholly incredible. And I'll point to the ---- Counsel, is your argument that there's a case out there that says I can overturn an adverse credibility determination on the grounds that there was impeaching evidence that was also before the finder of fact that is inconsistent with that finding? Is that your argument? Well, my argument is there are material facts that certainly contradict that holding that the Court would have to consider, Your Honor. But that's always the case when a jury or a judge sitting as the trier of fact makes a factual determination as to who's lying and who's telling the truth. I've never seen a trial where everybody agreed on the fact. You don't go to trial on those cases. But also, Your Honor, you have to consider that just on certain findings of fact that have nothing to do with credibility, the district court ---- You're asking us to overturn the district court's express credibility findings as to who was telling the truth and who was lying. And if so, what case can you cite to me gives us the authority as a court of appeals? Well, I don't have a specific case to cite with respect to that. I don't think you're going to find one. I think what you're going to find are Ninth Circuit cases that says that appellate courts are in the worst position to overturn those because we didn't see the case try. But with regards to certain findings of fact, Your Honor, there are evidence that do contradict certain findings of fact that the district court made. Okay. But that's different from the adverse credibility. Now we're moving on to other factual findings. Yes, we are. Okay. All right. Number one is the key issue in my mind is the determination that Mr. Dibbins is solely just an escrow agent with regards to these CMOs. And that clearly ignores basically the transactions here and what occurred. Now, it is admitted by Respondents and even the judge finds that with regards to the immediate CMO, Mr. Saviors and L&J, was the authorized agent and representative to take these and basically use his best judgment as how to deal and dispose of these CMOs. And consequently, L&J did enter into an agreement with a predecessor, Wise Guys, when that transaction didn't work out. The record reflects there was actually a back-and-forth between L&J and Mr. Dibbins as to basically whether Mr. Dibbins and Matrix would be responsible. Now, there are certain evidence points and evidence that were submitted, which were uncontested, that the Court ignored. And I'll refer the Court, for example, to Appellant's Excerpt of Record, Volume 2, 126.   And late in July, Jim Saviors still approaching Mr. Dibbins saying, listen, I still would like to work with you with regards to doing this new trade opportunity. I, you know, I can represent, I'm the owner of it, and you can say that you're dealing with it and working with me on an escrow agent. The other evidence that the Court ignored, which goes to the issue of negotiations leading up to the March 10th, 2009, agreement in which Mr. Dibbins was given the role of placing the major CMO, is Excerpt of Record, Volume 2, page 124. After, and this comes from Bethel Harris, their counsel, after demanding first that the CMOs be returned. This letter clearly talks about deal negotiations for Mr. Dibbins attempting to place it in trade. And there's also a correspondence, e-mail correspondence from Mr. Harris, again, the attorney, which is Appellant Excerpt of Record, Volume 1, excuse me, Volume 2, page 211. I called this an Olive Branch contract negotiation e-mail, in which basically Mr. Harris is saying, listen, we want to try to reach a resolution of this, let's try to work together on this and do something on extending an Olive Branch to you. So the Court ignored this evidence that there was a back and forth in terms of what Mr. Dibbins' role was going to be after his role. The Court found significant the fact that no contract was ever signed by all parties. No, no, no. That's with regards to the B&G issue. Oh, I thought we were talking about B&G. No, no. We're talking about Amidra. Amidra, okay. Okay. Yeah. They did sign their argument was we were coerced into doing it. And as you know, that the Court specifically rejected. Yeah. Now, with regards to B&G, the Court found that Mr. Dibbins was not credible at all, and he didn't believe them when he said there had been correspondence and there had been discussions, basically, with B&G about him placing the CMOs. I have to say, you have to go back first to the fact that there was a motion. Counselor. Yes. Counselor, I've been listening to your argument now for seven minutes. I'm looking at myself in this particular situation with the idea that what is my standard of review for a district court who goes right through this and tries to make these determinations in a trial situation? And so what's my standard of review? Well, with regards to finding the fact you're under the standard of review that there would be clearly erroneous finding of facts, and we're continuing. Well, but I guess what I'm arguing about, then, it seems to me that one needs to determine what facts the district court relied on which were clearly erroneous, rather than citing me all the things that you think are things they should have thought about, because the district court evidently didn't think those were quite appropriate. So, I mean, I went through each one of these and tried to come up with evidence that would support the district court's decision and say, is there no evidence to support what the district court did? And I couldn't find one. But, Your Honor, if there could be. And I can find evidence on every one of these. But. So then I was saying to myself, well, they better dispute some of this evidence. They better say some of this evidence is stupid or it has no basis or something, or otherwise I'm stuck supporting the district court. Well, we are disputing this evidence. Well, you're just disputing it with your idea of what the evidence is, which is not challenging the very evidence the district court looked at. Well, no, Your Honor, it's not my idea of what the evidence is. It is what the evidence that has been submitted without objection and taken into account. I mean, the Court clearly stated and, in fact, elicited testimony with regards to Mr. Saviors, his wide discretion as an authorized agent to do whatever he deemed that was appropriate with the necessary to the CMOs. You know, in their briefs, both B&G and Medra claimed that their agents was outside their apparent or actual authority by, you know, dealing with Mr. Divens in terms of trying to place these CMOs, that his only role was to act as an escrow agent. So with regards to the wide agency authorization principle, that's there already. That's established. I mean, and the Court even elicited that from the testimony. With regards to his view as an escrow agent, the Court admits and B&G admits, certainly, that there was never an escrow agreement entered into with Mr. Divens, either orally or written. In the one escrow agreement with regards to Medra that was entered into, Mr. Divens' status was changed from an escrow agent by the March 10, 2009, agreement in which he was retained to do what Wiseguy Investments was originally going to do, which was to take these CMOs and place them in a trade program. Now, the Court admitted evidence of that agreement, testimony regarding that agreement. So clearly to say Mr. Divens is an escrow agent under the March 2009 agreement is clearly erroneous in terms of fact, and there are no escrow duties imposed on him in that agreement. So the conclusion of law reached by the Court that Mr. Divens, with respect to these CMOs, was an escrow agent is totally without basis in fact and is not supported by the law. And as I point out in the City Club Genetec case and also the Wolf case cited therein, with respect to the agreements Mr. Divens had with both L&J, the authorized representative of Medra, and Upright Holdings, the authorized agent of B&G, the whole purpose was a mutually beneficial profit business arrangement. Can I interrupt you and ask you, in your brief you argue that there was the judge made a mistake by not accepting certain extrinsic evidence. And I was never ñ it was never clear to me what extrinsic evidence was it that he didn't receive. Your Honor, quite frankly, I don't remember that particular point in the brief. I can point to evidence actually that was submitted that he particularly ignored. One of the things that ñ Or rejected, didn't it? I'm sorry. Didn't allow it to be admitted? Oh, I think, well, there was the Frank Wilde declaration, which was stricken for hearsay and other reasons. I understand that. That wasn't ñ okay. Well. Right. But the other issue that I just want to point to, the other evidence that the judge totally ignored, which was actually submitted into evidence, you do have a e-mail from Brian Stallings, who was actually one of the owners of the CMO, which essentially supports Mr. Divens' position. It wasn't objected to. It wasn't stricken. It was admitted to the evidence. And Mr. Stallings is essentially saying, and this is found at the excerpt of record, volume two, page 182, this is a letter to Chase in which he is saying, no, Mr. Divens is supposed to be placing these in a CMO trade program. You know, Mr. Savior doesn't speak with me. He's not the owner of my CMO. Mr. Divens is doing what he's supposed to do, and you need to release this because you're jeopardizing a trade program that Mr. Divens has prepared and is ready to enter these CMOs into. And this was, of course, the North Coast Property Investment Program, and at that time, securities were frozen in the Chase Investment Security Account based on the false and defamatory accusations of Mr. Saviors and others that Mr. Divens had, quote, unquote, stolen these. I mean, Mr. Stallings' letter clearly contradicts that, and that was never challenged, objected to, was submitted in the evidence. So that is another indication that Mr. Divens was not acting as an escrow agent, merely to sit on these CMOs while B&G and Amidra and Upright Holdings and L&J decided what they were going to do. But to overturn the Court's factual finding, wouldn't we have to conclude that in evaluating all of the evidence that the district court heard sitting as the finder of fact, including that particular piece of evidence, no reasonable fact finder could have reached the factual conclusion that he did? And I think, yes. And I don't think no reasonable. Isn't that the standard that we have to apply? Right. I don't think any reasonable fact finder could conclude, Your Honor, if you look at the evidence that was submitted. Some of it critically important, which Judge Wilson ignored. There is not a reasonable basis for finding Mr. Divens to be an escrow agent. Even as to Betz & Gamble? No. Not even as to Betz & Gamble's. Because clearly I'll refer you to the Jamie Williams' e-mail, which is very important, and that's What are you going to do with the three letters indicating that he was an escrow agent? Well, in the Jamie Williams' e-mail, which is important, dated February 27, 2013 from Betz & Gamble to Divens, indicating that Divens wasn't that of an escrow. What are you going to do with those? Well, what I'm going to do with those is, first of all, it's contradicted by other evidence. Contradicted, but now we're back where I said. Concentrate on the evidence the district court looked at. There are three letters from Betz & Gamble to Divens. Betz & Gamble's had never consented to have the Cobalt CMO placed in a trading program. Both of those are facts. But, but your Honor. And both of those facts, in light of incredible testimony, I'm having a tough time saying clear error. Well, first there is an error because, one, the court is not recognizing the wide discretion that Jamie Williams had as an authorized agent of B&G to But doesn't take away from the very facts I'm talking about. But your Honor, these facts are certainly, I would say, overwritten by the subsequent letter much later in February 27, after that letter was written. Let me talk to you about the quantum merit. Yes. What benefit did Divens confer on Betz & Gamble or Hamidra? The district court found that there was all a scheme to defraud. How could there have been of any benefit from an unwanted and deceitful actions? Well, first of all, they weren't unwanted and they weren't deceitful. Well, they were, says the district court. Well, the district court is wrong. Oh, I see. So the district court is wrong and that's the only way we can get to this quantum merit theory? No. What you have to realize is, number one, in their argument, they're totally ignoring the agency argument we make in our briefs. They're saying, well, you didn't have any agreement with us to trade these CMOs, Mr. Divens. Yeah, but we did have it with our authorized agents, and they had, even according to admitted testimony, the authority to deal with these CMOs as they saw fit. That's with regard to Hamidra, that specific court testimony the court elicited from Mr. Savers. In fact, he says to him at one point, basically to the effect of, well, from my understanding is, quote, unquote, it seems to me that you were the strategic part of the partnership. In other words, you decided how the assets would be used. Yes, Your Honor. So the court – so the argument made by the Respondents is that, well, you had no direct relationship with us. Yes. But we did with the authorized agents who bound you, and we were taking action pursuant to their authorized agents to place these CMOs into trade. Well, I still don't know. I would like to know the answer to Judge Smith's question. What was the quantum error? What benefit did Betz and Gamble get from what your client did? Well, again, they would have gotten benefit from us being able to place these. They would have. Well, and this goes to my argument, but they frustrated the performance of that by claiming Mr. DeVance had stolen these CMOs. Let me ask you another question. Doesn't California law preclude quantum error as an equitable remedy when the express contract terms exist? Well, Your Honor, there's a question of ambiguity of whether that issue of interest is decided in a contract. And there are no express contract terms with regards to payment of interest. In fact, that's not contained into March 2009. I never found that in the hedging concepts. I'm sorry? I didn't find that idea in the hedging concepts. That's the California decision that says when there's an express contract and the contract is supposed to let out and say what the terms are, then we don't have quantum error. But that term of interest is not addressed, Your Honor. Well, if it's not addressed, then that may be that I can't get there. Well, I think you can consider basically whether either party should have been awarded interest, and certainly Mr. DeVance did expend the effort to try to place these CMOs into a trade program. And I note to the Court he was frustrated from doing that with the last trade program, North Coast Properties Investment, because of the very actions of the Respondents who frustrated his performance. They're tailing Chase. He's a fraud. He's a thief. He's stolen these. Chase says I have to freeze this. Mr. DeVance can't put it into a trade program that would have possibly paid out. And Mr. Stalling's letters that I referred to basically supports his position, saying I as an investor say yes, he's supposed to be placing these in trade. Based on what you've been told, which is false, the account has been frozen. This is detrimental to me, and it's jeopardizing a trade program that the CMOs are ready to be placed into. Mr. Parksman, you're way over your time here. Sorry, Your Honor. That's quite all right. You were answering our questions, but we'll hear from the other side. Good morning, Your Honor. Todd Thibodeau for Appellate and MedDRA. Your Honors, the District Court did – was not clearly erroneous when it concluded that Mr. DeVance took these CMOs under false pretenses, that once they were in his possession, he absconded with them, that he moved them from account to account to prevent MedDRA and B&G from locating the CMOs and retaining or retrieving them, and that he kept all the interest for his own personal use. Nor was the District Court clearly erroneous when, after listening to the evidence, it concluded that there was no agreement that Mr. DeVance was entitled to the interest under the CMOs. And in making that conclusion, the Court specifically looked at all of the communications, the litany of communications from Mr. Saver to Mr. DeVance that took place between January and the end of March 2009, in which Mr. Saver repeatedly asked for these CMOs back. And this is – this is detailed in excerpts of the record 15 through 19, pages 15 through 19 of the District Court's opinion. Mr. Saver repeatedly told Mr. DeVance that he had no authority to sell the CMOs. And, in fact, there's a specific email in March 2009 when Mr. Saver accuses Mr. DeVance of stealing the interest. This is ER-222. And Mr. DeVance responds that the interest is yours. We have every intention of paying you every dime. So not only was the District Court not clearly erroneous, but there was substantial evidence to support its conclusion that there was no agreement that Mr. DeVance would get to keep the interest from the CMO. With regard to quantum heroin, even if we get to quantum heroin, which we should not because there are two agreements with respect to Imidra, even if we get to quantum heroin, Mr. DeVance did not provide any benefit whatsoever to Imidra. It was strictly detriment all the way. He kept the CMOs. He prevented their return. He kept the money. So even if we got to the issue of quantum heroin, the District Court correctly, clearly, and not clearly erroneously determined that there was no benefit to Imidra and therefore quantum heroin doesn't help Mr. DeVance. The final two points that the District Court addressed that Mr. DeVance raised at trial in his brief were whether legal issues as to whether under Article 8 his rights as an entitlement holder somehow trumped the rights of the owner. And they clearly do not. Whatever rights he had as an entitlement holder under Article 8 did not affect the actual undisputed owner of the CMOs. They may have given him certain rights against the securities intermediary, but that's not at issue here. Finally, Mr. DeVance isn't protected by Section 8502 of the California Commercial Code because he did not acquire these CMOs for value. As the Court found, he acquired them under false pretenses. And he had notice from beginning to end at all time of adverse claims. So the District Court was correct in its conclusions of law, and it certainly was not clearly erroneous in its findings of fact. And for those reasons, this Court should affirm the District Court's judgment. Thank you. Thank you very much. The case just argued is submitted. We will take the call. I'm sorry. Oh, I'm sorry. I thought you guys were done. I mean, you're welcome. If you have something you want to say, go ahead. Do you want to rest on your briefs? I'll rest on my briefs. Okay. Then the case just argued is submitted, and we'll take our morning recess at this time.
judges: Benson, Tallman, Smith